**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERRY KOVAC, | ) | CASE NO. 5:12-CV-1467 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | | ORDER |
| SUPERIOR DAIRY, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court on defendant's motion for summary judgment. (Doc. No. 27.) Plaintiff has filed a response (Doc. No. 39), and defendant has filed a reply (Doc. No. 40). The summary judgment motion is fully briefed and is ripe for adjudication.

## I.    FACTUAL BACKGROUND

"[I]t is about the only thing you can do to not go out of your mind. . . . [Y]ou stand there and watch bottles come down at you. . . . [I]f you got tired of standing, you sit. When you got tired of sitting, you stood." (Beamer Dep., Doc. No. 33 at 1410-12.) For the employees of defendant Superior Dairy, Inc. ("Superior Dairy"), working leak check numbed the senses. When plaintiff Terry Kovac ("Kovac") refused to perform this apparently unenviable task, plaintiff was summarily terminated. The law lacks a remedy for refusing a tedious task. Defendant does not violate the Americans with Disabilities Act Amendments Act of 2008 ("ADA") by terminating an employee who refuses to surrender to tedium.

Over twenty years ago, a drunk driver struck plaintiff's motorcycle and severed plaintiff's right leg. (Kovac Dep., Doc. No. 28 at 841.) Though his leg was reattached, plaintiff has undergone over thirty operations on his leg, resulting in chronic foot drop, leg length discrepancy, a change in gait, and severe pain. (Doc. No. 39 at 1736.) At the time of the incident giving rise to this lawsuit, plaintiff's most recent surgery occurred in 2007. (Kovac Dep. at 846.)

Barbara Green, Superior Dairy's director of human resources, hired Kovac in 2006 as a dock worker, in which capacity he continued to work until December 14, 2010, the date of his termination. (Green Dep., Doc. No. 29 at 1128.) Superior Dairy processes, pasteurizes, bottles, and distributes milk, cheese, and ice cream products. The company employs "about 210" workers in its Canton, Ohio manufacturing plant, most of whom are unionized workers governed by a collective bargaining agreement. (Green Dep. at 1091-92.) The employees work in one of four plant departments: (1) laboratory, (2) distribution, (3) ice cream, or (4) milk. (*Id*. at 1093.) Each department contains a variety of jobs, allocated to employees through a bidding system based on seniority within the department. Plaintiff joined the milk department in the job known as "dock worker." (*Id*. at 1128.) Dock workers are assigned to various tasks, depending on the plant's needs and the shift in which the employees work. Tasks include "load[ing] and unload[ing] trucks, pull[ing] things off the line, stag[ing] them for loading . . .[,] a leak check job, . . . [and] mov[ing] the trailers back and forth in and out of the docks." (Shaffer Dep., Doc. No. 30 at 1231-32.) Management posted tasks for each employee in the dock worker job a week in advance. Two important dock worker tasks, for purposes of this motion, are yard dog and leak check.

Yard dog[1] principally involves driving semi-trailers stocked with Superior Dairy's products from the plant situated on one side of Navarre Road to the "staging area" on the other side of the road, where employees in the distribution department picked up the trailers for delivery to Superior Dairy customers. Both the dock area and the staging area are outdoors, and dock workers therefore perform the yard dog task in inclement weather. While standing on an elevated grate attached to the frame of the yard dog, the dock worker attaches and detaches air brakes and lighting hoses from the yard dog to the trailer. (Undercoffer Dep., Doc. No. 31 at 1326.) The dock worker must alight from the vehicle from time to time to open and close the trailer doors. (*Id*. at 1327.) When the dock worker reaches the staging area, he detaches the air brake and lighting hose, and uses a hand crank to lower the trailer's legs. (Kovac Dep., Doc. No. 28 at 884.) Additionally, a dock worker performing yard dog must document information about the trailer in a log and check temperatures in the plant and in the trailer. (*Id*. at 884-85.) All dock workers performing yard dog must possess a Commercial Driver's License (CDL). Kovac performed this task without complications.

When performing the leak check task, a dock worker stands next to a conveyor belt that moves up to two lines of milk containers past the dock worker. The dock worker inspects the containers for leaks. The dock worker removes the leaking containers from the conveyor belt and places them on a pallet located several steps behind the dock worker. The number of leakers removed by dock workers in an eight-hour shift varies, with reports ranging from "a few dozen" containers (Undercoffer Dep. at 1310), to "100 leakers" (Beamer Dep. at 1413), to "one to two pallets" consisting of 224 containers each. (Smith Dep., Doc. No. 32 at

---

[1] Yard dog is also the name used for the vehicle the dock workers drive in performing the task.

1374.) Each container weighs around eight pounds. (Undercoffer Dep. at 1308.) The dock worker does not and cannot control the conveyor belt. (Green Dep. at 1156.) Occasionally, the palletizer that stacks the containers breaks down. Because the dock worker does not control the conveyor belt, the belt continues to move and the dock worker, assisted by whomever is nearby, stacks the gallons on pallets by hand. The conveyor belt moves eighty containers every minute. (Kovac Dep. at 926.)

        Plaintiff performed the leak check task for one half hour before the day he was terminated. On this occasion, plaintiff performed leak check as described above for buttermilk, which moved down the conveyor belt at a slower pace than the milk. (Kovac Dep. at 919-20.) Plaintiff did not use a stool during the half hour and felt that the pace was too strenuous on his leg. (*Id.* at 921.) Additionally, plaintiff, along with other dock workers, assisted on the leak check task when the machine malfunctioned. Plaintiff was unable to perform the leak check task for an entire shift because Superior Dairy did not allow dock workers to use stools when performing leak check, and plaintiff could not stand for an entire eight-hour shift without a break. (Green Dep. at 1141.) The dock workers' close proximity to hundreds of leaking milk containers exposed stools to bacteria, which could accumulate in the stool over time. (*Id.*) This safety directive notwithstanding, several Superior Dairy dock workers performed the leak check task using chairs (Undercoffer Dep. at 1307) and/or "three milk crates turned upside down with a foam pad . . . taped to the top" (Smith Dep. at 1370; *see also* Beamer Dep. at 1410.) When performing leak check from a seated position, dock workers watch and wait for a leaking container, stand up or lean over the conveyor belt to grab the leaker, and stand up to walk two or three steps to the pallet to place the leaker on the pallet. (Beamer Dep. at 1411-12.)

4

As stated above, plaintiff underwent surgery on his right leg in summer 2007. A July 13, 2007 letter from plaintiff's treating physician, Dr. Curtis R. Noel, summarized plaintiff's work restrictions following this surgery. Plaintiff could "[l]ift 100 pounds occasionally, 50 pounds frequently[,]" "walk 4 out of 8 hours[,]" "sit 6 out of 8 hours[,]" and "[o]ccasionally climb, bend, and squat," though only "infrequently[.]" (Doc. No. 27-4 at 399.) Dr. Noel also gave the following permanent work restrictions: "[n]o climbing ladders[,]" "[n]o push or pull more than 50 pounds[,]" and "1 hour or less" of "continuous work on feet[.]" (*Id.*) In response to Superior Dairy's requests for clarification of the above restrictions, Dr. Noel stated that Kovac could be on his feet for four hours, but would need a break before being on his feet for another four hours. (*Id.* at 400.) Though Kovac could climb in and out of a semi-truck, Dr. Noel specified that Kovac could not climb ladders and could not tolerate more than three to four steps at a time. (*Id.* at 400, 403.) Given these restrictions, Dr. Noel "believe[d] [Kovac] can do the dock worker job. If it doesn't require frequent bending/kneeling and if he doesn't have to push/pull > 50 lbs frequently." (*Id.* at 401.)

Superior Dairy gave plaintiff reduced hours on his return from the 2007 surgery, and plaintiff worked his way back to full-time hours as a dock worker. (Kovac Dep. at 848-49.) Superior Dairy reviewed the work restrictions with Kovac and determined which tasks in the dock worker position plaintiff could perform. (Green Dep. at 1131-32.) Given his work restrictions, plaintiff felt he could perform all dock worker tasks except line operator, in which the dock worker takes milk off the line. (Kovac Dep. at 919.) The leak check task did not exist in the plant until 2009. (Green Dep. at 1134.) Later, Superior Dairy accommodated an additional restriction, scheduling plaintiff for two days off after five continuous days of work. (Doc. No. 27-8 at 558.) At some point after the 2007 surgery, plaintiff's supervisor assigned plaintiff the

5

line operator task, and plaintiff performed the task for three days before plaintiff asked to be taken off that task. (Kovac Dep. at 923-34.) Superior Dairy accommodated this request. (Green Dep. at 1137.)

In 2008 and 2009, plaintiff's family physician, Dr. Dennis C. McCluskey, prescribed plaintiff the narcotics oxycodone and OxyContin for plaintiff's leg pain.[2] (McCluskey Dep., Doc. No. 35 at 1583-84.) At the end of 2009, Superior Dairy ordered Dr. Richard Reichert to examine plaintiff, wanting another opinion on plaintiff's restrictions and concerned that plaintiff "would act like he wasn't really totally aware of his surroundings[.]" (Green Dep. at 1164.) Plaintiff tested positive for narcotics, and Superior Dairy removed him from duty until plaintiff produced a clean urinalysis. (*Id*. at 1164-65.) Kovac did so and returned to his dock worker position. Dr. Reichert agreed with the restrictions as set forth by Dr. Noel and opined that the restrictions were likely permanent. (*Id*. at 1167.)

In the weeks and months before the events of December 14, 2010, Superior Dairy notified plaintiff of several complaints related to plaintiff's performance. The uptick in plaintiff's performance issues coincided with the replacement of plaintiff's former supervisor, Curtis Canton, by Jim Smith, plaintiff's supervisor at the time of his termination. (Kovac Dep. at 930, 939.) While plaintiff had received complaints in the past (Kovac Dep. at 935-36), the incidents were minor and apparently infrequent. Beginning in May 2010, however, Green informed Kovac that customers had contacted Superior Dairy with complaints over Kovac's performance. (Doc. No. 27-8 at 540.) Kovac loaded trucks incorrectly and took overlong breaks, resulting in delayed

---

[2] Pursuant to Dr. McCluskey's policy for controlled substances like oxycodone, plaintiff entered into a verbal pain contract, promising to take oxycodone and OxyContin only as prescribed by Dr. McCluskey. (McCluskey Dep. at 1583.) When plaintiff failed to adhere to Dr. McCluskey's pain contract, Dr. McCluskey refused to prescribe any more narcotics.

deliveries. Issues with Kovac's work performance continued into fall 2010, with Kovac failing to scan and load trucks properly, receiving a warning "that should these issues continue[,] your employment will be terminated." (*Id.* at 542.) By the end of 2010, Superior Dairy decided to assign Kovac to a job with reduced customer interaction and impact. (Green Dep. at 1139.) After reviewing Kovac's work restrictions, management settled on leak check. (*Id.* at 1142.)

In December 2010, plaintiff discovered he needed yet another surgery. (Kovac Dep. at 980.) He posted "I'm going back under the knife" on Facebook. (*Id.*) On December 14, 2010, after this post, plaintiff reported to work and attended a meeting at the beginning of his shift with Barbara Green, Smith, and union steward Chris Crider. (Kovac Dep. at 979-80.) During the meeting, Kovac was informed that Superior Dairy planned to assign him to leak check. (Green Dep. at 1142.) Green told Kovac that Superior Dairy felt the new task would better accommodate Kovac's leg restrictions. (Kovac Dep. at 982.) Superior Dairy would provide a stool, so plaintiff could sit as he performed leak check. (Green Dep. at 1142.)

In response, Kovac "told Jim Smith there is no way that could be done sitting down for eight hours straight on a stool. You have to get up off the stool." (Kovac Dep. at 984.) According to Kovac, Smith reiterated Superior Dairy's belief that leak check, provided Kovac could use a stool, fell within Kovac's work restrictions. (*Id.*) Unconvinced he could perform leak check, a task formerly outside his work restrictions, Kovac responded, "I have to talk to my doctor before I make any further changes as far as jobs that were formerly restricted or I feel that I couldn't do." (Kovac Dep. at 985.) The meeting adjourned.

Plaintiff, rather than immediately reporting to leak check for his December 14th shift, started performing his previously assigned loading job. (Green Dep. at 1143.) Smith instructed Kovac to report to leak check three times, and plaintiff refused each time. He told

7

Smith that he wanted to check with his physicians before he changed his work duties. (Green Dep. at 1144; Kovac Dep. at 985.) Smith informed plaintiff that Superior Dairy believed that leak check fell within plaintiff's job restrictions. When plaintiff steadfastly refused to report to leak check, Smith sent plaintiff home. (Green Dep. at 1145.)

On December 16, 2010, plaintiff filed a union grievance for his removal from work on December 14. (Doc. No. 27-8 at 560.) The same day, plaintiff attended a meeting with Green, Smith, union official Dale Shaffer, union president Robert Jackson, and Chris Soehnlen to discuss the grievance and the leak check incident. (Green Dep. at 1146; Kovac Dep. at 996.[3]) The next day, Green met with Dan Soehnlen and Chris Soehnlen to discuss Kovac's future with Superior Dairy and decided to terminate him. (Green Dep. at 1147.) Shortly thereafter, Green met with the union to discuss Kovac's termination. Superior Dairy sent plaintiff a letter dated December 17, 2010, apprising plaintiff of his termination. (Doc. No. 27-8 at 559.) Union official Shaffer informed plaintiff of the same by telephone. Plaintiff filed an additional grievance on December 17, 2010, for "discharge without just cause." (Doc. No. 27-8 at 561.) The union decided not to pursue arbitration. (Shaffer Dep. at 1285.)

## II.      PROCEDURAL HISTORY

On April 11, 2011, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). (Doc. No. 27-8 at 601.) Plaintiff filed a complaint in the Stark County Court of Common Pleas on May 29, 2012, and defendant removed the action to this Court on June 11, 2012. (Doc. No. 1.) Plaintiff's complaint asserted claims under the ADA, Ohio Rev. Code § 4112.02, and for intentional infliction of emotional distress.

---

[3] Kovac does not state that Smith attended this meeting.

Defendant initially filed a motion to dismiss, which the Court converted into a motion for summary judgment, regarding whether plaintiff's claims are subject to mandatory arbitration. (Doc. No. 4; Minute Order, February 13, 2013.) In an order and opinion dated March 12, 2013, the Court denied the motion for summary judgment and dismissed plaintiff's claim for intentional infliction of emotional distress. (Doc. No. 13.) The Court also determined that Kovac's claims are not time-barred. Defendant filed the instant motion for summary judgment on plaintiff's remaining state and federal claims on November 8, 2013. (Doc. No. 27.)

**III.      STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material

9

fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park Racing Ass'n*., 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

IV.     **LAW AND ANALYSIS**

A.     **Federal Claims**

Under the ADA, "employers are prohibited from discriminating against a qualified individual with a disability because of his or her disability in employment matters, such as hiring, advancement, and discharge." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 479 (6th Cir. 2012). A "qualified individual with a disability" is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" 42 U.S.C. § 12111(8). Both "disability" and "qualified individual" require further definition. Under the ADA, "disability" means "a physical or mental impairment that substantially limits one or more major life activities" of an individual. 42 U.S.C. § 12102(1)(A). "Major life activities" include, among others, "walking," "lifting," and "bending." 42 U.S.C. § 12102(2)(A). An individual is "otherwise qualified" for a position when that individual "can perform the essential functions[,]" or "fundamental job duties" of the position. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 985 (6th Cir. 2011). Plaintiff alleges two instances of discrimination in violation of the ADA: (1) the failure to accommodate and (2) termination, which the Court shall address in turn.

1.     **Failure to Accommodate**

An employer discriminates against an otherwise qualified individual on the basis of a disability when it does not make "reasonable accommodations to the known physical or mental limitations" of the individual unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation" of its business. 42 U.S.C. § 12112(b)(5)(A). A failure to accommodate claim "unavoidably 'involve[s] direct evidence (the failure to accommodate) of discrimination' because the employer necessarily relied on the

11

worker's disability in making decisions." *Cash v. Siegel-Robert, Inc.*, -- F. App'x --, 2013 WL 6231791, at *4 (6th Cir. Dec. 3, 2013) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868-69 (6th Cir. 2007)). Accordingly, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) does not apply.

In direct evidence cases, the plaintiff bears the burden of showing that he "(1) has a disability, and (2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 490 (6th Cir. 2013) (citation and internal quotation marks omitted).

Plaintiff must establish that he "requested and was denied" a reasonable accommodation. *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002). Plaintiff's burden includes showing both that plaintiff proposed an accommodation and that the proposed accommodation was reasonable. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (citation omitted).[4] The employer has no duty to provide a reasonable accommodation until plaintiff requests same. *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005) (no failure to accommodate when plaintiff remained silent). To properly request a reasonable accommodation, plaintiff need not use any "magic words[,]" like accommodation, disability, or ADA. *Leeds v. Potter*, 249 F. App'x 442, 449-50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). Plaintiff must, however, tie the request, in context, to his existing medical restrictions. *Id.*

---

[4] The burden of showing undue hardship, not alleged in this case, rests with the employer. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

Upon request for reasonable accommodation, plaintiff triggers "an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). In the Sixth Circuit, the informal, interactive process is mandatory. *Lafata v. Church of Christ Home for Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (quoting *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008)). Accordingly, "[p]arties should not obstruct the process, or refuse to participate" in good faith, *Jakubowski*, 627 F.3d at 202, and ought to participate directly with each other. *Kleiber*, 485 F.3d at 871.

If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would have been possible. *Lafata*, 325 F. App'x at 422 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002)). On the other hand, when the employer engages with an employee who refuses to participate in good faith or withholds essential information, the employer cannot be liable under the ADA for failure to accommodate. *Wells v. Chrysler Grp., LLC*, No. 3:08CV2264, 2013 WL 2631371, at *6 (N.D. Ohio June 11, 2013); *see also Kleiber v. Honda of Am. Mfg. Co.*, 420 F. Supp. 2d 809, 828 (S.D. Ohio 2006) ("An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer."), *aff'd by* 485 F.3d 862 (6th Cir. 2007).

Though the employer need not "propose a counter accommodation in order to participate in the interactive process in good faith[,]" doing so "may be additional evidence of good faith." *Jakubowski*, 627 F.3d at 203 (citations omitted). Meeting with the employee, discussing reasonable accommodations, and suggesting other possible positions for the employee satisfies the requirement of good faith participation. *Id*. It behooves an employer to propose a

13

reasonable accommodation—an employee "cannot force [his] employer to provide a specific accommodation if the employer offers another reasonable accommodation." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (citing *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004)). An employee who rejects a proposed reasonable accommodation "is no longer considered a 'qualified individual with a disability.'" *Hedrick*, 355 F.3d at 457.

　　　　If properly respected by employer and employee, the interactive process ought to result in a reasonable accommodation. Reasonable accommodations include "making existing facilities . . . readily accessible to and usable by individuals with disabilities;" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations[.]" 42 U.S.C. § 12111(9). "In determining whether an accommodation is reasonable, the employer must consider (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998) (citing 29 C.F.R. § 1630.9(a), appendix).

　　　　An employer does not fail to provide a reasonable accommodation when there is more than one accommodation, and the employer chooses "[a] less expensive accommodation[,] [an] accommodation that is easier to provide[,]" *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996), or an accommodation other than the accommodation that the *employee* prefers. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 459 (6th Cir. 2002).

14

Here, defendant appears to concede that plaintiff is "disabled" under the ADA, instead arguing *infra* that plaintiff is not disabled for purposes of Ohio Rev. Code § 4112.02. Accordingly, the Court assumes for purposes of the motion that plaintiff is disabled. Plaintiff simply cannot carry his burden for the remaining elements of a failure to accommodate claim. The parties do not dispute that, without some sort of accommodation, Kovac could not perform the essential functions of the leak check task because it would require standing by the conveyor belt for eight hours. (Green Dep. at 1141.) Accordingly, Kovac must either show that he could perform leak check with an essential function eliminated[5] or that he could perform leak check with a reasonable accommodation. The law in this circuit speaks clearly on reasonable accommodations: "the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable." *Jakubowski*, 627 F.3d at 202. Kovac simply does not allege that "he asked [Superior Dairy] to grant him a reasonable accommodation to return to his job . . . or to transfer him to a less strenuous job commensurate with his physical restrictions." *Cash*, 2013 WL 6231791, at *4. Each time Superior Dairy asked him to perform leak check, Kovac simply refused. He did not ask to be reassigned to another task, he did not propose any adjustments to the leak check job, and he did not engage in any dialogue with Superior Dairy beyond, "no, I need to speak with my doctor."[6] Kovac may have thought of some adjustments to the leak check

---

[5] Curiously, neither party expends much effort discussing this prong of the test. The Court must give due consideration to the "employer's judgment as to what functions of a job are essential[.]" *Jakubowski*, 627 F.3d at 201. Giving such consideration to Superior Dairy, the Court concludes that it reasonably determined that leak check was an essential function of Kovac's dock worker job. Kovac's documented issues with loading trucks and performing yard dog in a timely fashion justified the decision to assign him to a task with reduced customer impact and interaction.

[6] Despite some superficial appeal to plaintiff's argument that merely asking to speak to a doctor is a request for reasonable accommodation, the Court concludes that it is not. As stated above, reasonable accommodations include "making existing facilities . . . readily accessible to and usable by individuals with disabilities;" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." 42 U.S.C. § 12111(9). Speaking to

15

task—wearing an insulation sock and changing his boots—but he never proposed these adjustments. (Kovac Dep. at 990.)

This case presents the odd situation in which, while the employee made no attempt to propose a reasonable accommodation, the *employer* took it upon itself to do so. The Court finds that Superior Dairy attempted to accommodate Kovac in performing the leak check task. Based on plaintiff's work restrictions, Superior Dairy did not assign leak check to Kovac because "he could not stand the entire eight hours." (Green Dep. at 1136.) Plaintiff's undisputed work restrictions also provided that he could stand and walk at least four of eight hours of an eight-hour shift. (Doc. No. 27-4 at 399.) When Superior Dairy allowed Kovac to use a stool to perform leak check, the main work restriction separating him from executing the leak check task simply evaporated. Plaintiff would lift eight pounds frequently, well within his work restriction. (*Id*.) He would not need to climb, balance, or squat, though some bending would be required.[7] An employee who does not propose a reasonable accommodation and also rejects a proposed accommodation may not maintain a claim for failure to accommodate. *See, e.g.*, *Nance*, 527 F.3d

---

a doctor does not make facilities accessible, restructure a job, reassign an employee, modify equipment, adjust examinations, training material or policies, or provide an interpreter or reader. Nor is speaking to a doctor "similar" to any of those accommodations. Speaking to a doctor does not change anything or modify anything: it simply is not within the class of accommodations contemplated by the statute.

[7] In a letter dated September 12, 2013, more than two years after plaintiff's termination, Dr. McCluskey, one of plaintiff's two treating physicians, opined that the addition of the stool would not have complied with plaintiff's work restrictions. Even if plaintiff predominately sat on the stool during leak check, plaintiff would "bend from the stool to pick up a gallon of milk [then place] it on the pallet. This required Mr. Kovac to bend[,] stand[,] place the gallon on a pallet and repeat." (Doc. No. 39-1 at 1762-63.) Plaintiff's work restrictions included frequent bending, and leak check involved at least some bending, even with a stool. Whether the stool was a reasonable accommodation for leak check, given the bending involved, is immaterial to the Court's analysis. After defendant proposed an accommodation it believed was reasonable based upon its understanding of plaintiff's restrictions, plaintiff failed to propose an alternative accommodation (reasonable or otherwise), as required by law. Instead, plaintiff responded to a proposed accommodation with intransigence rather than good faith interaction. Accordingly, plaintiff's failure to accommodate claim fails whether the stool constituted a reasonable accommodation or not. *See Jakubowski*, 627 F.3d at 302 ("the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable"); *Kleiber*, 420 F. Supp. 2d at 828 ("An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer.").

at 557 (summary judgment for employer on reasonable accommodation claim when employee who did not propose an accommodation refused to perform machine-cleaner position with "crude[,]" though effective, tools recommended by physical therapist); *Hedrick*, 355 F.3d at 459 (affirming summary judgment on reasonable accommodation claim when "referral center scheduler position" was rejected by registered nurse who proposed no other accommodation); *Bare v. Federal Express Corp.*, 886 F. Supp. 2d 600, 613 (N.D. Ohio 2012) (granting employer summary judgment on reasonable accommodation claim when employee was informed of all open positions and how they could be restructured for her and employee neither requested an open position nor proposed another accommodation).

Nor do the facts presented to the Court show that Superior Dairy bears any responsibility for the breakdown in the interactive process. Indeed, Superior Dairy's conduct—investigating which positions plaintiff could perform, calling a meeting, explaining the job change, proposing an initial accommodation—points to good faith participation. *See Jakubowski*, 627 F.3d at 203 ("no question" of good faith participation when employer met with employee to discuss accommodations, considered employee's proposed accommodations and explained why they were unreasonable). Perhaps defendant could have engaged in more discussion after Kovac requested to speak to his doctor, asking Kovac how he felt he could comfortably perform leak check that day. Perhaps Superior Dairy could have delayed starting Kovac on leak check to allow him time to consult with physicians. The law does not require a perfect interactive process, just good faith participation. Superior Dairy participated in good faith.

When the Court looks at the record "to isolate the cause of the breakdown and then assign responsibility[,]" it must attribute the breakdown to Kovac. *Talley*, 542 F.3d at 1110 (citation omitted). Confronted with the change in his assigned task, Kovac refused until he could

17

speak with his doctor. Asked to report to the new task, Kovac refused until he could speak with his doctor. Instructed to perform the new task that very evening, Kovac refused until he could speak with his doctor. Entrenched intractability is not good faith participation in the interactive process. Indeed, it is not interaction at all. Responsibility for the breakdown in the interactive process falls on Kovac, who flatly refused to participate in any discussions. Because he did not propose a reasonable accommodation, rejected a proposed accommodation, and refused to participate in good faith in the interactive process, Kovac's claim for failure to accommodate fails as a matter of law.

### 2.  Discriminatory Discharge

To establish discriminatory discharge, the ADA requires the plaintiff to show: (1) that he is disabled; (2) that he is qualified and able to perform the essential functions of the job; and (3) that the employer took an adverse action—termination—against him because of his disability. *Bailey v. Real Time Staffing Servs., Inc.*, --F. App'x--, 2013 WL 5811647, at *2 (6th Cir. Oct. 29, 2013) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998)). To meet the third requirement, plaintiff must establish that his disability was a but-for cause of the adverse action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

When considering discriminatory discharge through circumstantial,[8] as opposed to direct, evidence, the Court applies the three-step burden-shifting framework articulated in

---

[8] Unlike the failure to accommodate claim, the discharge claim centers on the actual termination, not the discussions over plaintiff's ability to perform leak check because of his disability. As such, it involves circumstantial evidence of discrimination, not direct evidence. In a discriminatory discharge case, direct evidence would exist when an employer told an employee that his work restrictions precluded him from a position with the employer, so the employer must terminate him. Here, Superior Dairy did not discharge Kovac because it determined that his disability prevented him from performing his job duties. It discharged plaintiff for failing to follow his supervisor's instructions. If plaintiff can establish discriminatory discharge, he must use circumstantial evidence to navigate

*McDonnell Douglas*. *See Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). First, plaintiff must establish a prima facie case. To make out a prima facie case of discriminatory discharge, plaintiff must show that (1) he was disabled under the ADA; (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; (3) he suffered adverse employment action; (4) the employer knew or had reason to know of the employee's disability; and (5) the disabled individual was replaced. *Hedrick*, 355 F.3d at 453 (citation omitted). Once plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." *Jones*, 488 F.3d at 404 (citation omitted). If the employer so articulates, plaintiff must then "prove by a preponderance of the evidence that the proffered reason was in fact pretext designed to mask illegal discrimination." *Id*. If plaintiff's evidence creates a "genuine dispute at each stage" of this inquiry, plaintiff defeats summary judgment. *Id*. (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 3634 (6th Cir. 2007)).

Even if the Court were to assume that plaintiff could establish a prima facie case for discriminatory discharge, plaintiff cannot survive the second and third prongs of *McDonnell Douglas*. He cannot show that the proffered reason for his discharge was pretextual or masked unlawful discrimination. Superior Dairy told plaintiff time and time again to report to leak check, and plaintiff steadfastly refused. Thus, Superior Dairy sent plaintiff home and terminated him for insubordination, a violation of the employee handbook. (Doc. No. 27-8 at 534.) Superior Dairy had summarily terminated employees in the past for insubordination on the job. (Green Aff., Doc. No. 27-6 at 415-16.) Insubordination is a legitimate, non-discriminatory reason for Kovac's

---

through the burden-shifting obstacle course of *McDonnell Douglas*.

termination.

Given that defendant articulated a legitimate reason for terminating plaintiff, plaintiff must prove that the reason "was simply a pretext designed to mask discrimination." *Jones*, 488 F.3d at 406. To carry his burden, plaintiff must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Id*. (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Plaintiff does not argue that defendant's justification for his discharge has no basis in fact; indeed, he admits that he did not follow his supervisor's instructions. (*See, e.g.*, Kovac Dep. at 988.) Plaintiff's supervisor ordered him to leak check. Plaintiff did not go when ordered. Quite simply, that is insubordination. The union's investigation into the incident determined that Kovac "did not want the Company to have videotaped evidence that [he] could perform" leak check. (Doc. No. 27-10 at 668.) He did not want to sit in front of a conveyor belt for eight hours to tend to leaky bottles, so he elected not to follow his supervisor's instructions. The insubordination has a basis in fact and has been readily admitted to by plaintiff.

Nor can plaintiff show that his insubordination did not actually motivate his discharge. Kovac had requested and received accommodations in the past due to his disability. Superior Dairy assigned Kovac the line operator job, which he performed for several days before complaining of severe leg pain. When Kovac asked to be removed from the line operator job, Superior Dairy assented. When asked to give Kovac two days off after five days of work, Superior Dairy complied. When Kovac struggled with pain management and narcotics, Superior Dairy allowed him to take a leave of absence and return to his former position when able. When Kovac had surgery in 2007, Superior Dairy extended medical leave and allowed Kovac to work

his way back to full-time employment. Not until Kovac unequivocally refused to follow his supervisor's orders did Superior Dairy take an adverse employment action. The Court must conclude that insubordination actually motivated the termination.

Finally, plaintiff cannot show that insubordination was insufficient to motivate the discharge. Defendant submitted the Green affidavit, in which she recounted multiple cases in which insubordination led to summary termination at Superior Dairy. (Green Aff. at 415-16.) Attempting to show that insubordination was insufficient for discharge, plaintiff points to his history of "compl[ying] with Superior Dairy through the years in obtaining medical documentation of his disability and compl[ying] when the dairy put him on medical leave in order to be evaluated by a doctor of Superior Dairy's choosing." (Doc. No. 39 at 1751.) Indeed, the record abounds with documentation from plaintiff's doctors relating to his work conditions and previous allowances made by Superior Dairy. But that evidence does not show that insubordination was insufficient to motivate plaintiff's discharge. Superior Dairy prohibited insubordination, had terminated others for engaging in insubordination, and terminated plaintiff for it. Here, the Court concludes that insubordination was sufficient.

Plaintiff has not raised a genuine issue of material fact that insubordination, the legitimate non-discriminatory reason for plaintiff's termination advanced by defendant, was pretextual. Accordingly, his discriminatory discharge claim fails as a matter of law.

### B.    State Claims

Plaintiff asserts that Superior Dairy discriminated against him on the basis of his disability in violation of Ohio law. Ohio law makes it "an unlawful discriminatory practice . . . [f]or any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire,

tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). "Ohio courts are guided by federal decisions interpreting the [ADA]." *Greer v. Cleveland Clinic Health Sys.-E. Region*, 503 F. App'x 422, 430 (6th Cir. 2012). Still, Ohio defines "disability" in its own way; namely

> a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio Rev. Code § 4112.01(A)(13).

The parties dispute at some length whether plaintiff was disabled under Ohio law, but the Court need not decide that issue. The Court has already determined that Superior Dairy produced a legitimate non-discriminatory justification for its decision to terminate plaintiff and further determined that plaintiff did not show that defendant's justification was pretextual. Because plaintiff has not presented a genuine issue of material fact, his state law disability claims also fail as a matter of law. The Court only adds that any reliance placed by defendant on *Kovac v. Lowe's Home Ctrs., Inc.*, No. 5:05cv2276, 2006 WL 1644336 (N.D. Ohio June 7, 2006) to show that plaintiff is not disabled under Ohio law is wholly inappropriate. Since that decision, Kovac has undergone at least one additional surgery, and numerous knee injections, as well as the interlude in which he struggled to manage his pain medications. Kovac's physical conditions, work restrictions, and job duties in 2006 do not control this case. Nevertheless, for the reasons set forth above, Kovac has not created a genuine issue of material fact that his termination was pretextual. Nor can he show that he proposed and was denied a reasonable accommodation under Ohio law, as analyzed above.

22

## V.  CONCLUSION

For the reasons set forth above, Superior Dairy's motion for summary judgment is GRANTED. Kovac's claims each fail as a matter of law. This case is DISMISSED.

**IT IS SO ORDERED**.

Dated: February 12, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**